*Attorney Grievance Commission v. Earl Americus Smith*
Misc. Docket AG No. 73, September 2013 Term


**Attorney Discipline - Neglect of Clients - Mishandling of Attorney Trust Account - Delegation of Attorney's Duties to Non-lawyer without Supervision - Disbarment**. Disbarment is the appropriate sanction when an attorney, in connection with his personal injury practice, delegated communications with clients, negotiations with insurers and other defendants, and handling of settlement proceeds to a non-lawyer assistant without adequate supervision, failed to appropriately review and oversee an attorney trust account with the result that a non-lawyer assistant was able to misappropriate $600,000 over a four-year period, failed to take reasonable remedial measures when it was evident that the trust account was being invaded but instead commingled personal funds in the trust account in violation of the Maryland Rules, and also failed to communicate with, and follow the directions of, his clients in several cases.

MLRPC 1.1, 1.2(a), 1.3, 1.4, 1.5(c), 1.15, 5.3, 5.5, 8.4(a), (c) & (d); Maryland Rules 16-606.1, 16-607, 16-609.

Circuit Court for Prince George's County
Case No. CAE13-37242
Argued: January 9, 2015

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 73

September Term, 2013

ATTORNEY GRIEVANCE COMMISSION

OF MARYLAND

v.

EARL AMERICUS SMITH

Barbera, C.J.
Harrell
Battaglia
Greene
McDonald
Rodowsky, Lawrence F. (Retired,
    Specially Assigned)
Cathell, Dale R. (Retired, Specially
    Assigned),

JJ.

Opinion by McDonald, J.

Filed: June 23, 2015

Attorney discipline cases that result in disbarment often find the attorney committing one of the seven deadly sins – *e.g.*, greed, lust, sloth. This is not one of those cases. The sin in this case was inattention – inattention to clients, inattention to an attorney trust account, and inattention to the activities of a non-lawyer assistant in whom the attorney misplaced his trust and who misused the attorney trust account to the detriment of the attorney's clients. Sadly, this too merits disbarment, as our regulation of the practice of law must protect the public not only from those attorneys who engage in deliberate, egregious acts of misconduct, but also those who fail to fulfill the routine duties of the profession that serve and safeguard their clients.

# I

## Background

### A.    *Procedural Context*

The Attorney Grievance Commission ("Commission") charged Earl Americus Smith, III with violating numerous provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") arising out of the management of his attorney trust account, his delegation of tasks to his non-lawyer assistant, and his handling of several client matters.

Specifically, the Commission charged Mr. Smith with violating MLRPC 1.1 (competence), 1.2(a) (scope of representation), 1.3 (diligence), 1.4 (communication), 1.5(c) (fees), 1.15 (safekeeping property), 5.3 (responsibilities regarding nonlawyer assistants), 5.5(a) (unauthorized practice of law), 8.1(a) (false statement in connection with disciplinary matters), and 8.4(a) (violation of MLRPC), (c) (conduct involving deceit) and (d) (prejudice

to the administration of justice). The Commission also charged Mr. Smith with violating Maryland Rules 16-606.1 (attorney trust account record keeping), 16-607 (commingling of funds), and 16-609 (prohibited transactions). The Commission later withdrew the charge as to MLRPC 8.1(a).

Pursuant to Maryland Rule 16-752(a), this Court designated Judge Larnzell Martin, Jr. of the Circuit Court for Prince George's County to conduct a hearing concerning the alleged violations and to provide findings of fact and recommended conclusions of law. Following a three-day hearing at which Mr. Smith testified and was represented by counsel, the hearing judge issued his findings of fact and conclusions of law. On the basis of those factfindings, the hearing judge concluded that Mr. Smith committed all of the alleged violations.

The Commission did not except to the hearing judge's findings and conclusions; it recommended that we disbar Mr. Smith. Mr. Smith conceded most of the violations, but filed an exception to the hearing judge's conclusion that he was responsible for violations of MLRPC 8.4 and argued for a suspension rather than disbarment. The Court heard oral argument on Mr. Smith's exception and the recommendations for sanction in January 2015.

**B.    *Facts***

The hearing judge's factual findings are uncontested; we therefore treat them as established. Maryland Rule 16-759(b)(2)(A). The hearing judge's findings, the parties' stipulations, and the undisputed evidence in the record establish the following facts.

*Mr. Smith's Law Practice*

Mr. Smith was admitted to the Maryland Bar in 1983. He is also a member of the District of Columbia Bar. During 1991, Mr. Smith established a law practice under the name of Bryan & Smith, P.C., which focused on personal injury matters. Since the mid-1990s, Mr. Smith has been the only attorney at the firm.[1] The key facts relevant to the alleged violations concern Mr. Smith's delegation of responsibility to – and failure to supervise – his legal assistant, his mishandling of his attorney trust account related to personal injury cases, and his neglect of several client matters, all during the period 2009-2012.

*Delegation of Responsibility to Dawn Staley-Jackson*

During 1993, Mr. Smith hired Dawn Staley-Jackson[2] as a paralegal. Ms. Staley-Jackson worked for the firm for the next two decades as a legal assistant. During the time period relevant to the alleged violations, her name appeared on the firm's stationery with the title "Legal Assistant."

Mr. Smith delegated substantial authority to Ms. Staley-Jackson. Indeed, the hearing judge found that he "allowed Ms. Staley-Jackson to run his law practice without any meaningful oversight." With Mr. Smith's knowledge and acquiescence, Ms. Staley-Jackson independently sent demand letters to defendants, negotiated settlements with insurance

[1]Joseph M. Bryan, the other named member of Bryan & Smith, P.C., retired from the practice of law and had no involvement with Mr. Smith or the firm during the time relevant to these proceedings.

[2]In the record, Ms. Staley-Jackson is referred to variously as Dawn M. Staley, Dawn M. Jackson, or Dawn Staley-Jackson.

carriers, communicated with and advised clients, dealt with medical providers, drafted pleadings and other papers for filing in court (frequently signing Mr. Smith's name), and deposited checks.

Mr. Smith gave Ms. Staley-Jackson responsibility for preparing settlement disbursement sheets, and for meeting with the client to explain the settlement sheet. Mr. Smith would not check the accuracy of the lists of disbursements with the client's file, other than to check the gross amount and his own fee. Mr. Smith also delegated to Ms. Staley-Jackson the responsibility to inform clients that settlement funds had been received.

After Ms. Staley-Jackson informed Mr. Smith that she was suffering from a serious illness, he permitted her to work from home, to take client files to her house, and to forward the office phone to her home and personal cell phone.

*Operation of Personal Injury Trust Account*

Mr. Smith maintained two attorney trust accounts at SunTrust Bank – one for attorney's fees and the other for receiving and disbursing funds in personal injury cases. The alleged violations concern the operation of the personal injury trust account. At all relevant times, Mr. Smith had sole check-signing authority for the personal injury trust account and used a computer software program to record deposits and disbursements and to issue checks payable from that account.

From January 2009 continuing through September 2012, Mr. Smith failed to create or maintain any meaningful records relating to the personal injury trust account. He did not

4

keep accurate chronological listings of all deposits and disbursements, and failed to generate individual client matter records. Mr. Smith did not reconcile his trust account records on a monthly basis.

Mr. Smith ordinarily received monthly bank statements by mail. He testified that, sometime during 2010, the bank statements began to arrive by mail either sporadically or not at all. He said that he would go to the local branch to obtain a bank statement each month, but did not request copies of the negotiated checks. When Mr. Smith did receive a statement in the mail, it included photocopies of checks drawn on his trust account, but he did not regularly review these checks.

*Ms. Staley-Jackson's Fraud*

Beginning in at least 2009, Ms. Staley-Jackson regularly and systematically misappropriated funds from the firm's personal injury trust account by diverting checks drawn on that account payable to others or by fraudulently creating and cashing checks made payable to herself. During the first seven months of 2009, Ms. Staley-Jackson took checks made payable to Jason Carle, a chiropractor who had rendered services to Mr. Smith's clients. Ms. Staley-Jackson would forge Mr. Carle's endorsement, sign the check herself, and cash the check. She cashed approximately 15 checks payable to Mr. Carle for more than $34,000 from January to July 2009. After July 2009, Ms. Staley-Jackson was apparently able

to create and cash checks drawn on the trust account that listed herself as the payee.[3]   The

parties stipulated that, during the period from January 2009 through September 2012, Ms.

Staley-Jackson misappropriated the proceeds of checks exceeding $600,000 in value.

*Deposit of Personal Funds into Attorney Trust Account*

Ms. Staley-Jackson's diversion of funds from the personal injury trust account resulted

in insufficient funds in that account to cover the purposes for which the funds had been

deposited.  When Mr. Smith realized in 2010 that the personal injury trust account was short

of funds, he attempted to compensate for the shortfall with personal funds.

Mr. Smith deposited his own personal funds or placed borrowed funds into the trust

account on five separate occasions from December 2010 through June 2012.  On December

1, 2010, Mr. Smith cashed out his personal retirement account and deposited that money

($35,900) into the personal injury trust account.  On February 10, 2011, Mr. Smith obtained

a $10,000 loan from his father and deposited it into the trust account.  On April 18, 2011, Mr.

Smith deposited into the trust account another loan from his father in the amount of $50,000.

On March 5, 2012, Mr. Smith deposited into the trust account another $25,000 – this time

---

[3]The record does not indicate how Ms. Staley-Jackson was able to create checks with her own name as the payee.  Mr. Smith testified that he would cut checks by using a computer software program that printed each check after he input the payee's name and the amount.  According to Mr. Smith, he was the only one who knew the password for the computer program, and there had been no duplicate orders of blank checks.  Mr. Smith testified that he failed to notice the fraud because Ms. Staley-Jackson created checks payable to herself for the exact amount due to an actual client or third party, ensuring that the balance noted in the computer program would match the balance in his trust account.

a loan from his father-in-law. On June 21, 2012, Mr. Smith deposited $100,000 into the trust account, also obtained from his father-in-law.

The hearing judge found that these deposits belied any assertion that Mr. Smith was unaware of the serious deficiencies in the personal injury trust account – that it lacked sufficient funds to cover his existing fiduciary obligations to clients and third parties. In other words, Mr. Smith was aware for more than a year and a half that his personal injury trust account at SunTrust Bank was out of trust. However, as the hearing judge found, his "persistent failure over a period of almost four years to comply with the trust account record-keeping requirements" of the Maryland Rules meant that he was unable to detect the source of the shortfall and enabled Ms. Staley-Jackson "to get away with her theft scheme for as long as she did."

Eventually the influx of personal funds failed to compensate for the misappropriations. In September 2012, SunTrust Bank reported to Bar Counsel an overdraft of Mr. Smith's trust account.

*Late Payments to Medical Providers*

In many of Mr. Smith's personal injury cases, the client and Mr. Smith signed an undertaking requested by a medical provider who had treated the client in which they agreed that Mr. Smith would pay fees owed to the provider directly from any settlement proceeds that he received on behalf of the client. During the time that Ms. Staley-Jackson was

7

misappropriating funds from the trust account, these payments were made late, or sometimes not at all.

For example, in July 2010, Mr. Smith deposited a personal injury settlement check in the amount of $4,000 for the benefit of his client Teonka Young. On August 5, 2010, Ms. Young signed a settlement disbursement sheet that listed a disbursement of $625 to New Carrollton Therapy, a medical provider that had treated Ms. Young. Ms. Young received her portion of the settlement. However, a check payable to New Carrollton Therapy for the benefit of Ms. Young was not issued until April 17, 2012.

On March 31, 2011, Mr. Smith deposited a settlement check for the benefit of his client Robert Mayo in the amount of $7,300. On May 26, 2011, Robert Mayo signed a settlement disbursement sheet that listed disbursements of $1,216.50 to Chris Brannigan, an attorney, and $2,500 to Alpha Health Center-Oxon Hill. A check for Mr. Mayo's portion of the settlement was issued on May 25, 2011. However, the checks payable to Mr. Brannigan and Alpha Health Center-Oxon Hill were not issued until 10 months later, on March 9, 2012.

On March 31, 2011, Mr. Smith deposited a personal injury settlement check in the amount of $15,500 for the benefit of client Robin Mayo. In September 2011, Mr. Smith provided Robin Mayo with a settlement disbursement sheet that listed a disbursement of $5,305 to Alpha Health Center. Ms. Mayo received her portion of the settlement on September 23, 2011. A check payable to Alpha Health Center for the benefit of Robin Mayo was not issued until April 3, 2012.

8

Mr. Smith testified that he would not have sent out these payments in March and April 2012 without first checking his computer program's accounts to ensure he had not already paid these medical providers. However, Mr. Smith did not check the client files, which were then located in Ms. Staley-Jackson's house, or examine his bank statements. Instead, he talked with Mr. Staley-Jackson regarding the discrepancy and relied on her information.

Beginning in the late summer of 2011, James Bolger, a collection agent for several chiropractor facilities, began to call Mr. Smith to alert him about unpaid bills owed to those facilities by Mr. Smith's clients. When Mr. Smith was unresponsive, Mr. Bolger filed several complaints with the Commission regarding his inability to obtain payment from Mr. Smith on the unpaid medical bills. After Mr. Bolger filed complaints with the Commission, Mr. Smith issued ten checks in March and April 2012 to various medical providers represented by Mr. Bolger. Mr. Smith was aware that his trust account did not contain the necessary funds to pay the amounts due and obtained the $25,000 loan from his father-in-law in March 2012 to help cover the deficit.

*Discovery of the Fraud*

Following notice in September 2012 from SunTrust Bank that he had an overdraft on his trust account, Mr. Smith discovered that the bounced checks had been payable to Ms.

9

Staley-Jackson.  Mr. Smith then retrieved his client files from Ms. Staley-Jackson's home on October 4, 2012, and shortly thereafter fired Ms. Staley-Jackson.[4]

*Unauthorized settlements and diversion of proceeds*

Several complaints received by the Commission concerning Mr. Smith revealed a pattern of delegation to Ms. Staley-Jackson, settlement of claims by her without the client's knowledge, and the diversion of the settlement proceeds.

*– Orin H. Thomas, Jr.*

Mr. Smith represented Orin H. Thomas, Jr. on a contingent fee basis with regard to a personal injury claim arising out of a motor vehicle accident that occurred on September 1, 2006.  On August 27, 2009, Mr. Smith filed a complaint on behalf of Mr. Thomas in the Circuit Court for Prince George's County.  The complaint named two defendants, Joy Felicia Lee, who was insured by Allstate, and Mr. Thomas's own insurance carrier, Metlife Auto & Home Insurance Company, later amended to name Metropolitan Group Property & Casualty Insurance Company ("Metropolitan") with respect to under-insured motorist benefits.

Following a settlement with Allstate for the policy limits, a check in the amount of $50,000 issued by Allstate and payable to "Earl Smith, Esquire & his client, Orin Thomas" was deposited into Mr. Smith's attorney trust account on October 13, 2009.  On November

---

[4]Mr. Smith reported Ms. Staley-Jackson's misappropriation to the police and obtained the assistance of the Calvert County Sheriff's Office in retrieving his files from her. Criminal charges were initiated against her in the District Court in Prince George's County. Those charges were apparently dismissed.  We were informed at oral argument that a criminal investigation remains open.

10

12, 2009, Mr. Smith issued a check drawn on his trust account and payable to Bryan & Smith, P.C. representing a partial attorney's fee payment. Mr. Smith did not inform Mr. Thomas that this fee disbursement was made and did not provide Mr. Thomas with a written settlement disbursement statement. Mr. Smith testified that he wrote checks to medical providers and lien holders on Mr. Thomas' behalf; but these checks were somehow converted into checks payable to Ms. Staley-Jackson.

On January 28, 2010, Mr. Smith filed a stipulation of voluntary dismissal as to Ms. Lee following the settlement with Allstate.[5] In October 2010, more than a year after depositing the settlement check from Allstate, Mr. Smith first issued a check from the settlement proceeds to Mr. Thomas for $3,000. From October 2010 to June 2012, Mr. Thomas received six checks from Mr. Smith, totaling $13,200. Mr. Thomas received no other disbursements from the settlement proceeds of $50,000. Mr. Smith testified that he did not distribute the remaining proceeds from the Allstate settlement because he expected there to be additional liens. Mr. Smith did not respond to Mr. Thomas' repeated requests for an accounting and for information regarding the case.

After the settlement with Allstate, the claim against Mr. Thomas' own insurance company, Metropolitan, remained pending in the circuit court. On February 24, 2011, Metropolitan filed a motion to compel discovery based on Mr. Smith's failure to respond to

---

[5]The Commission did not allege, and the hearing judge did not find, that Mr. Thomas' case against Ms. Lee was settled without Mr. Thomas' consent or knowledge.

11

discovery requests. Mr. Smith neither responded to the motion nor filed any discovery responses.

Mr. Thomas' case was scheduled for a pretrial conference on May 3, 2011. Mr. Smith did not appear for the pretrial conference and the court dismissed Mr. Thomas' case with prejudice. Mr. Smith testified that he did not appear for the pretrial conference because he never received the scheduling order or the discovery requests, and because he did not know that Metropolitan had been served. Instead, he thought negotiations (as conducted by Ms. Staley-Jackson) were ongoing. Mr. Smith knew of the dismissal of Mr. Thomas' claim against Metropolitan, but did not inform Mr. Thomas that his case had been dismissed.

– *Terry Hardy and the Hardy children*

Mr. Smith represented Terry Hardy and his two minor children, Terry Hardy Jr. and Deja Hardy, in a personal injury matter following a motor vehicle accident that occurred on August 26, 2009. The representation was on a contingent fee basis.

Without Mr. Hardy's knowledge or consent, Ms. Staley-Jackson negotiated a settlement for Mr. Hardy and his daughter, Deja Hardy. On March 2, 2011, Mr. Smith picked up two settlement checks from the Silver Spring office of State Farm Mutual Automobile Insurance Company. One check was payable to "Terry D. Hardy & Earl A. Smith, his attorney" in the amount of $7,000. The second check was payable to "Terry D. Hardy, as parent and natural guardian of Deja Hardy, a minor, & Earl A. Smith, his attorney" in the amount of $3,600. Mr. Smith personally deposited both checks into his trust account

on March 2, 2011. No settlement was negotiated or received on behalf of Terry Hardy, Jr. A signature purporting to be Mr. Hardy's appeared on the back of both checks, although Mr. Hardy was not aware of either check and had not authorized anyone to sign his name.

Neither Mr. Hardy nor his children received any of the settlement proceeds. Mr. Smith did not create or provide settlement disbursement sheets to Mr. Hardy and he did not create client matter records for the funds deposited in trust. Mr. Smith was not responsive to Mr. Hardy's telephone calls and requests for information.

*– Sharon Hardy*

Mr. Smith also represented Sharon Hardy, Terry Hardy's wife, in connection with a personal injury claim following a separate motor vehicle accident that occurred on September 1, 2009. Without Mrs. Hardy's knowledge or consent, Ms. Staley-Jackson negotiated a settlement of her claim. On May 25, 2011, a check from Progressive Insurance Company payable to Mrs. Hardy and Bryan & Smith, P.C. in the amount of $6,007 was deposited into Mr. Smith's trust account.

Mrs. Hardy never received any of the settlement proceeds. Mr. Smith did not generate or provide a settlement disbursement sheet to Mrs. Hardy, and did not create a client matter record for her funds deposited in trust. Mr. Smith was not responsive to Mrs. Hardy's telephone calls and voicemails.

13

*– Sheila Matthews*

Mr. Smith represented Sheila Matthews regarding a personal injury claim on a contingent fee basis following a motor vehicle accident that occurred on February 16, 2011. On December 8, 2011, Mr. Smith filed a civil complaint on behalf of Ms. Matthews in the District Court of Maryland, sitting in Prince George's County. The complaint named two defendants, Oscar Tyler, who was insured by Bankers Independent Insurance, and Tiffany Johnson, who was insured by ELCO Administrative Services.

Without Ms. Matthews' consent or knowledge, Ms. Staley-Jackson presented written settlement demands and eventually negotiated a settlement with ELCO Administrative Services for $1,600 in exchange for a release. On June 17, 2012, Ms. Staley-Jackson forged Ms. Matthews' signature on the release. On August 17, 2012, the settlement check in the amount of $1,600 payable to Sheila Matthews and Bryan & Smith, P.C. was deposited into Mr. Smith's personal injury trust account.

Ms. Matthews never received the settlement proceeds from the ELCO settlement. Mr. Smith did not provide a written settlement statement or other accounting of settlement funds.

After ELCO settled, the claim against the second defendant, Oscar Tyler and Bankers Independent Insurance, remained pending in the District Court and was scheduled for trial on September 26, 2012. Ms. Matthews received notice from Mr. Smith's office that her case had been set for trial, but she had no further contact with Mr. Smith prior to the trial date. Mr. Smith testified that he was aware of the trial date but that he had been told by Ms.

14

Staley-Jackson that the entire case had settled. Ms. Matthews appeared in court but Mr. Smith did not appear. When Ms. Matthews called Mr. Smith's office, she was told by Ms. Staley-Jackson that the entire case had been settled and that she should tell this fact to the court. Accordingly, Ms. Matthews informed the court that the case had settled, although in fact only a portion of her case had been settled. The court then dismissed the case.[6] Mr. Smith did not communicate with Ms. Matthews regarding the status of her case and had done no work to prepare for trial on September 26, 2012.

## II

### Discussion

The hearing judge concluded that Mr. Smith committed all of the violations alleged by the Commission, except for the allegation relating to MLRPC 8.1(a), which the Commission had withdrawn. We review the hearing judge's conclusions of law *de novo* – *i.e.*, without any special deference. Maryland Rule 16-759(b)(1). In the course of this review, we consider the exception filed by Mr. Smith. In particular, Mr. Smith excepts to the hearing judge's conclusion that he is responsible for the violation of several sections of MLRPC 8.4.

---

[6]After terminating Ms. Staley-Jackson, Mr. Smith filed a motion to vacate the dismissal of Ms. Matthews' case, which was granted. However, Ms. Matthews later discharged Mr. Smith as her attorney and later elected to voluntarily dismiss her case as to both defendants.

Mr. Smith's misconduct may be considered in three categories: (1) his failure to supervise Ms. Staley-Jackson; (2) his failure to comply with rules concerning his representation of his clients and the management of his personal injury attorney trust account; and (3) misconduct of Ms. Staley-Jackson for which Mr. Smith is responsible.

## A. Failure to Supervise Non-Lawyer Assistant

At the heart of most of the alleged violations in this case is the unsupervised delegation of many of Mr. Smith's responsibilities to his legal assistant. That unsupervised delegation is intertwined with violations directly committed by Mr. Smith as well as the misconduct of his legal assistant for which he bears responsibility. Unsupervised delegation is also itself a violation of the MLRPC.

*MLRPC 5.3(a) and (b) – Supervision of Non-Lawyer Employees*

MLRPC 5.3(a) and (b) require attorneys to take certain steps to ensure that non-lawyer employees act consistently with the lawyer's ethical responsibilities. MLRPC 5.3(a) requires that an attorney with managerial responsibilities in a firm "make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the [non lawyer's] conduct is compatible with the professional obligations of the lawyer." MLRPC 5.3(b) requires attorneys with direct supervisory authority over a nonlawyer to make "reasonable efforts" to ensure that employee's conduct is in fact compatible with the attorney's professional responsibilities. *Attorney Grievance Comm'n v. Zuckerman,* 386 Md. 341, 373-

16

74, 872 A.2d 693 (2005)*; Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 479, 671 A.2d 463 (1996).

Mr. Smith violated MLRPC 5.3(a) and (b). Instead of establishing reasonable measures to ensure that Ms. Staley-Jackson's conduct complied with his ethical obligations, Mr. Smith delegated to Ms. Staley-Jackson broad authority to act on his behalf with little supervision – such as permitting Ms. Staley-Jackson to negotiate with insurance companies and to obtain consent from clients to settle. He apparently relied on Ms. Staley-Jackson to run his practice with little to no supervision or effort to ensure that she actually performed the tasks delegated to her in a manner consistent with his ethical obligations. *Attorney Grievance Comm'n v Zuckerman*, 403 Md. 695, 714, 944 A.2d 525 (2008) (attorney's failure to instruct employees of the proper management of trust account and inform himself of the status of the employee's efforts to monitor the funds in the account, creating the opportunity for an employee to misappropriate funds, was a violation of 5.3(a) and (b)).

*MLRPC 5.5(a) – Unauthorized Practice of Law*

MLRPC 5.5(a) states that a "lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or *assist another in doing so*." (emphasis added). This rule does not prohibit lawyers from delegating functions to legal assistants and other non-lawyers, "so long as the lawyer supervises the delegated work and retains responsibility for their work." MLRPC 5.5, Comment [2].

17

When an attorney fails to make the "reasonable efforts" required by MLRPC 5.3(a) and (b) and fails to supervise a non-lawyer assistant, the end result will often be that the assistant engages in the unauthorized practice of law. Permitting a non-lawyer assistant to send demand letters to insurance companies, settle claims, and provide legal advice to clients without supervision constitutes assisting another in the unauthorized practice of law. *Attorney Grievance Comm'n v. Ambe*, 425 Md. 98, 129-30, 38 A.3d 390 (2012) (evaluating settlement offers, and providing legal advice to clients as to settlement was practice of law). Permitting a non-lawyer assistant to draft, edit, and file pleadings without supervision also constitutes assisting another in the unauthorized practice of law. *See Attorney Grievance Comm'n v. Bocchino*, 435 Md. 505, 535, 80 A.3d 222 (2013).

The hearing judge found that in carrying out various activities without supervision, Ms. Staley-Jackson engaged in the practice of law, a finding clearly supported in the record. Mr. Smith regularly delegated to Ms. Staley-Jackson the authority to send demand letters to insurance companies, negotiate settlements, communicate with and advise clients, communicate with medical providers, and draft and sign pleadings and other filings for the court, all with little or no supervision. Accordingly, Mr. Smith violated 5.5(a) by assisting Ms. Staley-Jackson in the unauthorized practice of law.

**B.** ***Misconduct in Relation to Clients and Trust Account***

*MLRPC 1.1 – Competence*

MLRPC 1.1. states: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

Mr. Smith failed to properly oversee his personal injury trust account and, as a result, failed to maintain the settlement monies in the account, resulting in negative balances as to individual clients and a negative balance overall as of September 2012. This was a violation of MLRPC 1.1. *See Attorney Grievance Comm'n v. Mungin*, 439 Md. 290, 305, 96 A.3d 122 (2014) (an attorney demonstrates his or her incompetence by failing to properly maintain settlement monies in a trust account resulting in negative balances). Mr. Smith's mismanagement of his trust account resulted in his failure to promptly pay clients and medical providers after receiving settlement proceeds. *See Zuckerman*, 386 Md. at 369 (failure to promptly deliver money to a client and to pay third parties demonstrates incompetence).

Mr. Smith also failed to act competently in his handling of the cases of Ms. Matthews, the Hardys, and Mr. Thomas. He failed to consult with Ms. Matthews regarding settlement of her case, to inform her that a settlement check had been received, and to appear in court on her behalf, resulting in the dismissal of the remainder of her case. Similarly, Mr. Smith failed to pursue litigation against Mr. Thomas' insurance company following the settlement

19

with Allstate, failed to respond to discovery requests and a motion to compel discovery, and failed to appear for a pretrial conference, resulting in the dismissal of part of Mr. Thomas' case. Mr. Smith failed to consult with the Hardys regarding the settlements, to inform them once settlement checks were received, and to respond to their requests for information. Such conduct violated MLRPC 1.1. *See Attorney Grievance Comm'n v. Barnett*, 440 Md. 254, 102 A.3d 310 (2014) (failure to notify client of hearing date, and otherwise to communicate with client, and withdrawal of exceptions without client's consent violated MLRPC 1.1); *Attorney Grievance Comm'n v. Garrett*, 427 Md. 209, 222, 46 A.3d 1169 (2012) (the failure to take action to further a client's case and appear at court proceedings violates the obligation to provide competent representation).

*MLRPC 1.2(a) – Scope of Representation*

MLRPC 1.2(a) states, in part, that "a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued." MLRPC 1.2(a) specifically obligates the lawyer to "abide by a client's decision whether to settle a matter." Mr. Smith violated MLRPC 1.2(a) by settling at least a portion of the cases of Ms. Matthews and the Hardys without the clients' knowledge or consent. *See Attorney Grievance Comm'n v. Thaxton*, 415 Md. 341, 362, 1 A.3d 470 (2010) (attorney violated MLRPC 1.2(a) by failing to obtain the client's consent to settle, notify client of when settlement funds were received, or pay medical bills on time).

20

*MLRPC 1.3 – Diligence*

MLRPC 1.3 directs a lawyer to "act with reasonable diligence and promptness in representing a client." This Court has stated that "an attorney violates [MLRPC] 1.3 when he or she does nothing whatsoever to advance the client's cause or endeavor." *Attorney Grievance Comm'n v. Blair*, 440 Md. 387, 402, 102 A.3d 786 (2014) (internal quotation marks and citations omitted).

Incompetence often goes hand in hand with a lack of diligence – a failure to act with reasonable diligence will often result in incompetent representation. For example, the failure to pursue a claim after filing a complaint demonstrates not only incompetence, but also insufficient diligence. *Attorney Grievance Comm'n v. Gray*, 436 Md. 513, 520, 83 A.3d 786 (2014). Failure to keep a client informed about the client's case, to promptly disburse settlement funds, or to respond to reasonable requests for information also violates MLRPC 1.3. *Attorney Grievance Comm'n v. Park*, 427 Md. 180, 192-93, 46 A.3d 1153 (2012); *see also Attorney Grievance Comm'n v. Goodman*, 426 Md. 115, 125, 43 A.3d 988 (2012) ("An attorney who agrees to pay client medical bills from recoveries in connection with his/her representation, and fails to do so in a timely manner after receipt of settlement or judgment funds, acts without reasonable diligence and promptness."); *Attorney Grievance Comm'n v. Kremer*, 432 Md. 325, 335, 68 A.3d 862 (2013) (attorney violated MLRPC 1.3 by being routinely unavailable to client's attempts to contact him and providing very little information when eventually reached).

21

Mr. Smith violated MLRPC 1.3 by filing a complaint against Bankers Independent Insurance on behalf of Ms. Matthews, but failing to take any action to advance that case. He also failed to act with diligence when he filed a complaint against Metropolitan on behalf of Mr. Thomas but failed to respond to discovery and took no action to further that case. He violated MLRPC 1.3 when he did not respond to reasonable requests for information from Ms. Matthews, Mr. Thomas, and the Hardys.

*MLRPC 1.4 – Communication*

MLRPC 1.4 states, in relevant part that:

> (a)    A lawyer shall:
>
> (1)    promptly inform the client of any decision or circumstance with respect to which the client's informed consent ... is required by these Rules;
>
> (2)    keep the client reasonably informed about the status of the matter;
>
> (3)    promptly comply with reasonable requests for information....
>
> (b)    A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

A lawyer who receives a settlement offer from opposing counsel "must promptly inform the client of its substance" unless the client has indicated the proposal would be unacceptable or has previously authorized the attorney to act. MLRPC 1.4, Comment [2].

22

Mr. Smith violated MLRPC 1.4(a) when he failed to communicate with his clients, to inform them of settlement offers, or to obtain their informed consent. Ms. Matthews and Mr. Thomas were unable to talk to Mr. Smith despite repeated efforts. Mrs. Hardy never met Mr. Smith in person and was unable to reach him for three years, despite numerous attempts by phone. Ms. Matthews, Mr. Hardy, and Mrs. Hardy were all unaware that their cases had been settled. Ms. Matthews and Mr. Thomas were not informed that part of their case had been dismissed. Such conduct violates MLRPC 1.4(a)(1)-(3) and 1.4(b). *See Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23, 37, 105 A.3d 467 (2014) (failure to inform client of settlement and dismissal of case and failure to respond to multiple, reasonable requests for information violated MLRPC 1.4(a) and (b)).

*MLRPC 1.5(c) – Contingent Fee Disbursement Statements*

MLRPC 1.5(c) states, in part, that "[u]pon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination." Mr. Smith represented Ms. Matthews, Mr. Thomas, Mr. Hardy and his children, and Mrs. Hardy, each on a contingent fee basis. However, Mr. Smith failed to provide any of these clients with a written statement indicating the client's recovery or payments to third parties.

23

*MLRPC 1.15(a) and (b) – safekeeping of trust funds*

*Maryland Rule 16-606.1 – trust account records*

*Maryland Rule 16-607 – commingling funds*

MLRPC 1.15(a) provides, in pertinent part, that "[a] lawyer shall hold [the] property of clients ... that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." MLRPC 1.15(b) bars an attorney from depositing the attorney's own funds in a trust account, except in specific circumstances permitted by the Maryland Rules. Maryland Rule 16-607(a) generally prohibits an attorney from commingling personal funds in a trust account.[7] Maryland Rule 16-606.1 requires an attorney to keep detailed records of deposits and disbursements for trust accounts, to cause a monthly reconciliation of the account, and to retain all related records for at least five years. A failure to keep records of deposits and disbursements also violates the directives of MLRPC 1.15(a).

Mr. Smith violated 1.15(a) and (b) and Maryland Rule 16-607(a) by depositing more than $220,000 in personal funds into his attorney trust account on five separate occasions from December 2010 through June 2012. In addition, Mr. Smith's failure to maintain records

---

[7]There are some exceptions. Under Maryland Rule 16-607(b)(1), an attorney may deposit personal funds to satisfy bank fees or minimum balance requirements, as well as funds expected to be advanced on behalf of a client prior to reimbursement by the client. Funds that belong to both the client and the attorney may be deposited in the trust account, but the portion belonging to the attorney must be withdrawn when the attorney becomes entitled to them. Maryland Rule 16-607(b)(2). None of these exceptions pertain to the violations alleged in this case.

regarding his trust account and to perform monthly reconciliations violated MLRPC 1.15(a) and Maryland Rule 16-606.1.

*MLRPC 1.15(d) – notice of receipt of funds and prompt disbursement*

MLRPC 1.15(d) requires that an attorney, upon receiving funds or other property in which a client or third person has an interest, "promptly notify the client or third person" and "deliver promptly to the client or third person any funds or other property" to which they are entitled. Upon request by the client or third person, the attorney must "render promptly a full accounting regarding such property." MLRPC 1.15(d).

Mr. Smith violated 1.15(d) by failing to notify his clients, as well as third party medical providers, when he received settlement funds in which the client and these entities had an interest. Mr. Smith received settlement checks for Ms. Matthews, Mr. Hardy and his minor daughter, and Mrs. Hardy. These checks were deposited into Mr. Smith's trust account, but neither the clients nor interested medical providers were notified that there was a settlement or that funds had been received. In addition, Mr. Smith violated MLRPC 1.15(d) by failing to provide Mr. Thomas with an accounting of his settlement, despite Mr. Thomas' repeated requests.

Mr. Smith also failed to promptly disburse funds to medical providers that were entitled to portions of the client's settlement proceeds. Payments to Alpha Health Center and New Carrollton Therapy were delayed for more than a year after Mr. Smith received the settlement proceeds for the cases involving Robert Mayo and Robin Mayo. *See Mungin*, 439

25

Md. at 308-9 (attorney violated MLRPC 1.15(d) by failing to disburse funds due to client until 10 months after receiving funds and failed to pay medical providers for three years).

*MLRPC 1.15(e) – prompt disbursement of funds not in dispute*

MLRPC 1.15(e) states that a "lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute." Mr. Smith received a $50,000 settlement resolving part of Mr. Thomas' case. Mr. Smith used the settlement proceeds to pay his own fees and wrote checks to medical providers who were to be paid out of the settlement. Mr. Smith failed, however, to promptly distribute the remaining portion of the settlement to Mr. Thomas even though the remainder was not in dispute. Mr. Smith violated MLRPC 1.15(e) by waiting over a year to distribute any proceeds to Mr. Thomas; ultimately, he distributed only a portion of the proceeds to which Mr. Thomas was entitled. *See Goodman*, 426 Md. at 126-27 (attorney's failure to disburse money to medical providers after receiving a settlement check violated MLRPC 1.15(e) when the remaining amount of the settlement was no longer in dispute).

*Maryland Rule 16-609 – Trust Account*

Maryland Rule 16-609(a) provides that "[a]n attorney or law firm may not ... use any funds [required to be deposited in a trust account] for any unauthorized purpose." Additionally, Maryland Rule 16-609(c) prohibits attorneys from making disbursements "if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate."

Mr. Smith received settlement proceeds for the benefit of Mr. Thomas and deposited the monies into his attorney trust account. Mr. Smith then disbursed funds for his legal fees without obtaining his client's permission to do so. This was an unauthorized use of funds from his attorney trust account, regardless of Mr. Smith's intent, in violation of Maryland Rule 16-609(a). *See Attorney Grievance Comm'n v. Ross*, 428 Md. 50, 82, 50 A.3d 1166 (2012) (attorney violated Maryland Rule 16-609(a), regardless of his intent, when he received funds for the client's benefit and withdrew legal fees from the client's trust monies without obtaining his client's consent). By continuing to create checks drawn on his trust account from December 2010 through September 2012, despite knowledge that his trust account did not contain sufficient funds to cover his existing obligations to clients, Mr. Smith also violated Maryland Rule 16-609(c).

*MLRPC 8.4(c) – conduct involving dishonesty, fraud, deceit or misrepresentation*

MLRPC 8.4(c) states: "It is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" At one time this Court required a showing of intentional misconduct, as opposed to negligence, to establish a violation of MLRPC 8.4(c). *Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 684, 802 A.2d 1014 (2002) ("It is well settled that this Court will not find a violation of M[L]RPC 8.4(c) when the attorney's conduct is the product of negligent rather than intentional misconduct."). More recently, the Court has been willing to consider the possibility that negligent conduct may involve dishonesty, fraud, deceit, or misrepresentation. *See Attorney*

27

*Grievance Comm'n v. Nwadike,* 416 Md. 180, 194, 6 A.3d 287 (2010)*; Mungin*, 439 Md. at 314 n.11.  Here, the Commission has argued that Mr. Smith violated MLRPC 8.4(c) by his own intentional misconduct or is responsible for Ms. Staley-Jackson's intentional misconduct (*see* Part II.C. of this opinion below).  As our resolution of those charges is sufficient to support the sanction imposed, we refrain from parsing the distinction between intentional and negligent deceit in this case.

Mr. Smith violated MLRPC 8.4(c) by concealing material information from his client, Mr. Thomas.  The hearing judge found that Mr. Smith had actual knowledge that Mr. Thomas' claim against Metropolitan had been dismissed, but did not communicate this information to Mr. Thomas.  *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 555, 103 A.3d 629 (2014) ("Attorneys violate MLRPC 8.4(c) when they … conceal material information from their clients, even if they have not misrepresented explicitly the information.").  This is a finding of knowing misconduct, and there is no finding or evidence indicating that Mr. Smith's failure was the result of negligence or inadvertence.[8] Accordingly, because Mr. Smith concealed material information from Mr. Thomas, he violated MLRPC 8.4(c).

---

[8] In contrast, there is not clear and convincing evidence to find that Mr. Smith knew of the settlements but intentionally concealed the existence of the settlements from the Hardys or Ms. Matthews.  Similarly, the record does not show that, at the time Mr. Smith presented clients with settlement disbursement sheets, he knew that the representations on the settlement disbursement sheets were false.  Thus, he did not make an intentionally false statement in violation of MLRPC 8.4(c).

*MLRPC 8.4(d) – conduct prejudicial to the administration of justice*

"It is professional misconduct for a lawyer to … engage in conduct that is prejudicial to the administration of justice[.]" MLRPC 8.4(d). This Court has elaborated that "an attorney violates M[L]RPC 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Rand*, 411 Md. 83, 96, 981 A.2d 1234 (2009).

Mr. Smith violated MLRPC 8.4(d) by failing to properly manage his trust account – commingling client and personal funds, permitting an overdraft, and failing to keep adequate records of disbursements. Mr. Smith failed to disburse funds to medical providers on time, in violation of MLRPC 8.4(d). *See Mungin*, 439 Md. at 315 (being out of trust for several clients, failure to account for and disburse funds on time, and failure to pay medical providers on time violates MLRPC 8.4(d)); *see also Attorney Grievance Comm'n v. Davy*, 435 Md. 674, 707, 80 A.3d 322 (2013). On five separate occasions, Mr. Smith commingled personal funds with client trust funds, in violation of MLRPC 8.4(d). *See Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 297, 888 A.2d 344 (2005).

Mr. Smith's virtual abandonment of his practice to the charge of his non-lawyer assistant, with little or no supervision, to such an extent that she engaged in the unauthorized practice of law and was able to misappropriate client monies for almost four years constitutes conduct prejudicial to the administration of justice. Mr. Smith agreed to represent clients but failed to keep himself apprised as to the status of his clients' cases and failed to communicate

29

with clients, even when it was necessary to obtain the clients' informed consent. Moreover, Mr. Smith failed to appear in court on behalf of Ms. Matthews, resulting in her having to attend the hearing without counsel and in a false statement being made to the court. *See Davy*, 435 Md. at 707 (failure to provide competent and diligent representation, such as not communicating with clients and not appearing in court, constitute conduct prejudicial to the administration of justice). He failed to respond to discovery requests on behalf of Mr. Thomas, resulting in the dismissal of part of that case. *See Thomas*, 440 Md. at 556 ("A failure by an attorney to appear in court at a hearing on behalf of his or her client constitutes conduct prejudicial to the administration of justice[.]"). Mr. Smith's conduct caused significant harm to his clients both financially and in their ability to prosecute their claims in court and was therefore prejudicial to the administration of justice.

*MLRPC 8.4(a) – violations of the MLRPC*

MLRPC 8.4(a) provides in pertinent part that "[i]t is professional misconduct for a lawyer to ... violate ... the [MLRPC] ..." Because Mr. Smith has violated multiple provisions of the MLRPC, he necessarily violated 8.4(a). *Attorney Grievance Comm'n v. Kobin*, 432 Md. 565, 583, 69 A.3d 1053 (2013). Moreover, it is also a violation of MLRPC 8.4(a) to violate the MLRPC "through the acts of another." Here, Mr. Smith is responsible for reasons explained in the next section, for certain acts of Ms. Staley-Jackson that were contrary to the MLRPC.

30

## C.    *Responsibility for Misconduct of Non-Lawyer Employee*

On occasion, a non-lawyer employee of a lawyer may do something that the lawyer is prohibited from doing under the MLRPC. Is the employer attorney responsible for that misconduct? Under MLRPC 5.3(c), a lawyer is responsible for the misconduct of the non-lawyer employee in two types of circumstances.

First, the lawyer is responsible for the non-lawyer's actions "if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved." MLRPC 5.3(c)(1); *see Kobin*, 432 Md. at 583 (attorney was responsible under MLRPC 5.3(c)(1) for his office manager's failure to handle the firm's trust account properly when the attorney authorized the improper conduct); *Attorney Grievance Comm'n v. Johnson*, 409 Md. 470, 507, 976 A.2d 245 (2009) (imputing violations of MLRPC 1.15(d) and 8.4(c) to attorney who ratified actions of employees of his title company that involved improper disbursements of trust money, false settlement statements, and false affidavits of occupancy).

Second, even if the lawyer does not order or ratify the misconduct, if the lawyer is a partner in a firm or has direct supervisory authority over the employee, and "knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action," the lawyer is responsible for the misconduct. MLRPC 5.3(c)(2). This Court has rarely found an attorney responsible for a non-lawyer employee's misconduct under MLRPC 5.3(c)(2). *See, e.g., Glenn*, 341 Md. at 466 (attorney was responsible under MLRPC 5.3(c)(2) when the attorney knew or should have known that a transfer of certain

31

monies by his bookkeepers would reduce the escrow account balance to an unacceptable level, but failed to take reasonable steps to prevent the transfer); *Attorney Grievance Comm'n v. Ficker*, 349 Md. 13, 24, 706 A.2d 1045 (1998) (attorney was not responsible for employee's misconduct under MLRPC 5.3(c)(2) because, upon discovery of the misconduct the attorney took immediate remedial measures by stopping the misconduct, docking the employee's pay, and refunding money to clients harmed by the employee's misconduct); *Attorney Grievance Comm'n v. McDowell*, 439 Md. 26, 44, 93 A.3d 711 (2014) (lawyer not responsible under MLRPC 5.3(c)(2) because the attorney took reasonable remedial action once he learned of the misconduct).

The hearing judge concluded that Mr. Smith was responsible for Ms. Staley-Jackson's misconduct pursuant to MLRPC 5.3(c), although the judge did not specify which subsection supported that conclusion. With respect to MLRPC 5.3(c)(1), the record does not indicate that Mr. Smith ordered the misconduct by Ms. Staley-Jackson. Nor is there clear and convincing evidence that he ratified specific misconduct – as opposed to failing to supervise her adequately. It appears that the hearing judge's conclusion was based on MLRPC 5.3(c)(2).

Under MLRPC 5.3(c)(2), four elements must be present to impute an employee's misconduct to an attorney: (1) misconduct by the employee that would violate the MLRPC if done by the attorney; (2) partnership status or a direct supervisory relationship; (3) the attorney's knowledge of the wrongdoing at a time when its consequences can be mitigated;

32

and (4) the attorney's failure to take reasonable remedial action. There is no question that, had Ms. Staley-Jackson been an attorney, her conduct – including the intentional misappropriation of client funds, concealment of material facts, and misrepresentation – would have violated the MLRPC. Nor is there any question that Mr. Smith had the requisite supervisory relationship with Ms. Staley-Jackson. Thus, Mr. Smith's responsibility for her actions turns on the timing and extent of his knowledge of her misconduct and what, if any, remedial action he took.

*Mr. Smith's Knowledge*

As the hearing judge found, Mr. Smith had to know that there were serious deficiencies in his trust account by at least December 1, 2010, when he cashed out his personal retirement account and deposited $35,900 into the trust account to prevent the account from falling further out of trust. This knowledge was repeatedly confirmed as Mr. Smith found it necessary to deposit substantial personal funds into his trust account on four other occasions over the next 18 months.[9] Thus, Mr. Smith was not ignorant of the fact that his trust account was being violated. *See Glenn*, 341 Md. at 466 (accepting the hearing judge's finding that, although the attorney did not have specific knowledge of his employees' misconduct, he could not have been ignorant to the jeopardy facing his trust account because

---

[9]At the hearing, Mr. Smith testified that he believed the deposits of personal funds in the trust account were necessary to offset "operating expenses."

33

the attorney had exclusive check writing authority and the potential for a shortfall was apparent).

Second, as of March 2012, when Mr. Smith received complaints from Mr. Bolger regarding unpaid client bills, Mr. Smith also had to know that, despite the receipt of settlement proceeds by his office, various medical providers and third parties were not receiving payments promised from those proceeds. Mr. Smith also knew that he had presented settlement disbursement sheets to certain clients listing payments to medical providers that Mr. Smith now knew had not been made. For example, on August 6, 2010, Mr. Smith presented to his client Teonka Young a settlement sheet listing a disbursement of $625 to New Carrollton Therapy. As a result of Mr. Bolger's communications with Mr. Smith and Mr. Bolger's complaints to the Commission, Mr. Smith paid $625 to New Carrollton Therapy in April 17, 2012. He testified that he would not have made this payment without checking his computer program to make sure the payment had not been made previously. Similarly, the settlement disbursement sheets presented to Robert and Robin Mayo in May and September 2011 listed payments to medical providers that Mr. Smith knew, as of April 2012, had not been made. Nor could the discrepancies with respect to these clients be disregarded as isolated occurrences, as Mr. Bolger complained of non-payment for multiple clients treated in multiple medical facilities. Thus, as of March and April 2012, Mr. Smith knew or should have known that, although he deposited settlement

34

checks, disbursements to medical providers were not being made, and the disbursement statements presented to clients were not accurate.

Thus, Mr. Smith had knowledge that his client trust fund was continually being invaded and that payments were not reaching their intended recipients, contrary to the representations made on settlement sheets presented to clients. However, there was no specific factual finding by the hearing judge that Mr. Smith knew Ms. Staley-Jackson was re-creating checks drawn on the trust account and making them payable to herself or that she was creating false settlement disbursement sheets.[10]

Mr. Smith's ignorance of the details of the invasion of his trust account and the diversion of funds did not absolve him from the obligation to take reasonable remedial measures with respect to his trust fund for several reasons. First, Ms. Staley-Jackson was Mr. Smith's only employee. Second, this is not a case where the fraud was well concealed; rather a review of the account statements and negotiated checks would have revealed multiple checks over a four-year period payable from the trust account to Ms. Staley-Jackson. For example, during December 2010, Ms. Staley-Jackson cashed six checks payable to herself

_____

[10]Mr. Smith may not have had specific knowledge of every aspect of Ms. Staley-Jackson's scheme. For example, Mr. Smith did not seem to be aware that Ms. Staley-Jackson fraudulently settled claims without the client's knowledge or consent, forged client signatures on releases, or concealed the receipt of settlement funds from clients. Although his ignorance of her conduct is itself a violation of his duty to supervise under MLRPC 5.3(a)-(b), *see* Part II.A of this opinion above, there is not clear and convincing evidence to demonstrate that Mr. Smith had knowledge of this aspect of Ms. Staley-Jackson's scheme or that he was willfully blind to her misconduct.

drawn on the trust account, for a total of $20,010, almost completely offsetting Mr. Smith's deposit of personal funds made that same month. Third, the fraud would also have been detected had Mr. Smith been in contact with his clients, as any communication was likely to reveal that the clients had not received portions of the settlements to which they were entitled. Mr. Smith cannot avoid responsibility for the misconduct of his employee under MLRPC 5.3(c)(2) by remaining willfully ignorant of the employee's conduct in the face of clear indications of misconduct. *See Glenn*, 341 Md. at 481 (concluding in the alternative that, even if the attorney did not have knowledge of the misconduct, he was responsible under MLRPC 5.3(c)(2) because, had the attorney exercised a reasonable degree of supervision over the employee, he would have discovered the employee's misconduct earlier).

Mr. Smith had sufficient knowledge of misconduct relating to the operating of his trust account that his obligation to take reasonable remedial measures under 5.3(c)(2) was triggered.

*Reasonable remedial measures*

Despite Mr. Smith's knowledge that client funds in the trust account were being invaded as of December 2010, he failed to take any reasonable efforts to investigate why the trust account did not contain sufficient funds to cover his obligations and instead deposited personal funds into his trust account for more than a year. The failure to examine his client's files, check bank statements and negotiated checks, or otherwise attempt to investigate the

deficiencies in his trust account amounts to a failure to take reasonable remedial measures. Moreover, despite knowledge that medical providers were not receiving payments, Mr. Smith did not attempt to obtain the relevant client files, which he knew were then located at Ms. Staley-Jackson's home, or otherwise investigate why a substantial number of payments had not been received by medical providers. Mr. Smith wrote checks to satisfy Mr. Bolger's concerns after Mr. Bolger complained to the Commission, but Mr. Smith apparently made little or no effort to investigate the cause of the problem or address the harm or potential harm to his clients. He made no efforts to confirm whether Ms. Staley-Jackson was sending out checks to appropriate payees, but continued to rely on Ms. Staley-Jackson to prepare settlement sheets, transmit checks, and inform him which checks should be written.

Had Mr. Smith taken reasonable remedial measures in March and April 2012 to investigate why medical providers were not paid, he likely would have noticed the numerous checks payable to Ms. Staley-Jackson and would have been able to mitigate or prevent the misappropriation of $100,000 from the trust account by Ms. Staley-Jackson between April and September 2012.

*Summary*

Mr. Smith knew of the invasion of his trust account beginning in 2009 and would surely have learned the details of Ms. Staley-Jackson's misconduct had he taken reasonable remedial measures at that time, and might well have prevented most of the misappropriation of funds and other violations. But he failed to do so. Had Ms. Staley-Jackson been an

37

attorney, her conduct would have violated multiple provisions of the MLRPC and Title 16 of the Maryland Rules. Most egregiously, that conduct would have violated MLRPC 8.4(c) and (d) for the intentional misappropriation of client trust funds, and the creation of materially false disbursement sheets. Mr. Smith had direct supervisory authority over Ms. Staley-Jackson. Under MLRPC 5.3(c)(2), Mr. Smith is responsible for her misconduct.

*Mr. Smith's Exception*

Mr. Smith argues that he should not be held responsible for Ms. Staley-Jackson's intentional misappropriation of funds, false statements, or fraud that, if committed by an attorney, would amount to violations of MLRPC 8.4(c) and (d). Mr. Smith argues that, because the court must find intentional or willful conduct by an attorney for a violation of MLRPC 8.4(c) or (d), and because he did not intentionally violate those rules himself, he cannot be held responsible for violations of these provisions.

Even assuming Mr. Smith is correct that an attorney can never violate MLRPC 8.4(c) or (d) except through the attorney's own intentional misconduct, prior cases that refer to the necessity of intentional conduct were addressing direct responsibility.[11] MLRPC 5.3(c)(2) imposes responsibility on the attorney for failing to take appropriate action once the attorney has knowledge of an employee's misconduct. In the context of the attorney's responsibility under MLRPC 5.3(c)(2), it is the attorney's knowledge and failure to take reasonable remedial actions that imposes responsibility.

---

[11]*See* pp. 27-28 above.

38

Mr. Smith also argues that, because Ms. Staley-Jackson's conduct was criminal and because he could not have foreseen such intentional wrongdoing, he should not be held responsible for it. This Court has not adopted such a distinction. *See Johnson,* 409 Md. at 507 (imputing a violation of MLRPC 8.4(c) to an attorney under 5.3(c)(1) based on the intentional misconduct of an employee that resulted in the submission of a false statement). Nor would such a distinction serve the purpose of the rule, which is to ensure that attorneys take prompt remedial action once misconduct by a subordinate is discovered. We overrule Mr. Smith's exception and conclude that he can be held responsible for the intentional misconduct of Ms. Staley-Jackson.

### III

### Sanction

As in many attorney discipline cases, at this stage of the proceeding, the essential facts are no longer a matter of dispute and the legal determinations are either obvious or fine points with relatively little effect on the ultimate outcome. Our primary function is to fashion a sanction appropriate to the facts and the violations. As always, our purpose is "not to punish the errant lawyer but rather to protect the public, to maintain the integrity of the legal profession and to deter other lawyers from engaging in violations of the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Webster*, 348 Md. 662, 678, 705 A.2d 1135 (1998).

Bar Counsel argues for disbarment. Mr. Smith counters that his misconduct, although negligent, was not intentional and that the appropriate sanction is a suspension that allows for reinstatement "after a reasonable period of time."[12]

In determining the appropriate sanction, this Court considers the answers to four questions derived from the American Bar Association's *Standards for Imposing Lawyer Sanctions*: (1) What ethical duty was violated? (2) What was the lawyer's mental state? (3) What was the extent of the actual or potential injury caused by the misconduct? and (4) Are any aggravating or mitigating factors present?[13] *See Attorney Grievance Comm'n v. Taylor,* 405 Md. 697, 720, 955 A.2d 755 (2008).

*Nature of ethical duties violated*

Mr. Smith failed to comply with the rules governing attorney trust accounts with the result that he failed to carry out his fiduciary obligation to his clients and his promises to third parties to maintain funds in trust and to disburse funds promptly. Mr. Smith also failed his clients in delegating large parts of his practice to his lay assistant without supervision, failing to communicate with his clients, and failing to stay abreast of his cases. The apparent

---

[12] It should be noted that disbarment does not preclude reinstatement. *See* Maryland Rule 16-781.

[13] Potential aggravating and mitigating factors are listed in American Bar Association, *Standards for Imposing Lawyer Sanctions*, §9.22, Compendium of Professional Responsibility Rules and Standards (2012) at p. 475. *See Attorney Grievance Comm'n v. Coppock*, 432 Md. 629, 648-49 nn. 17-18, 69 A.3d 1092 (2013).

abandonment of his practice to his assistant compromised his ability to fulfill the ethical duties that govern the practice of law. These are serious lapses.

*State of mind*

The hearing judge did not find that Mr. Smith acted with malicious intent, and the record does not suggest that he did. But the hearing judge did find that Mr. Smith had reason to know his trust account was being invaded. Moreover, Mr. Smith's blanket delegation of authority to Ms. Staley-Jackson to communicate with clients, negotiate settlements, sign pleadings and other court papers, obtain client consent for settlements, and transmit and cash checks without adequate supervision relinquished his role and obligations under the disciplinary rules and was, at best, gross negligence. For example, when it became evident that his trust account was being invaded and payments were not being received by the appropriate payees, he was slow to investigate, to the detriment not only of his clients and the third party payees, but also of his own financial well-being as well. In attempting to make the trust account whole with family loans and out of his own pocket without conducting a thorough audit of the account, he delayed discovery of Ms. Staley-Jackson's defalcation and effectively facilitated her final theft of funds. We need not pinpoint where along the spectrum between gross negligence and knowing misconduct[14] he ultimately landed to conclude that his state of mind, while perhaps not evil, was not innocent.

---

[14] *See Glenn*, 341 Md. at 487 (the line between knowing misconduct and gross negligence is a thin one and hard to draw).

41

*Extent of injury to clients and others*

Mr. Smith's misconduct resulted in foregone claims, monetary injury to his clients, and delayed payments to third parties. A court dismissed with prejudice claims brought on behalf of Ms. Matthews and Mr. Thomas. Ms. Matthews, Mr. and Mrs. Hardy and the Hardys' daughter had their cases settled without their knowledge. The Hardys and Ms. Matthews never received proceeds from settlements to which they were entitled. Mr. Thomas intermittently received only a portion of the settlement in his case. Multiple medical providers were not paid fees to which they were entitled for months after Mr. Smith had received settlement proceeds out of which he and his clients had agreed payment would be made. Ironically, on the record before us, it appears that Mr. Smith and his family members may have incurred the greatest monetary loss as a result of his misguided efforts to shore up his trust account with personal funds.

*Aggravating and mitigating factors*

Mr. Smith's neglect as to his trust account and his clients constitutes a "pattern of misconduct" that is an aggravating factor. *See Kremer*, 432 Md. at 340. The fact that Mr. Smith is an experienced attorney with more than 30 years in the practice of law also counts against him as an aggravating factor. *See Attorney Grievance Comm'n v. Fader*, 431 Md. 395, 435-37, 66 A.3d 18 (2013).

As the hearing judge found, there are mitigating factors present. This was the first disciplinary proceeding initiated against Mr. Smith. Mr. Smith cooperated with Bar Counsel

42

and took responsibility for his failure to manage his trust account and to supervise Ms. Staley-Jackson. He also admitted to most of the violations charged by the Commission. The hearing judge found that Mr. Smith did not receive any personal benefit from Ms. Staley-Jackson's fraud and that he had no knowledge of criminal activity. It also appears to be undisputed that Mr. Smith is very active in his community as a leader in youth activities and as a volunteer in a local band that gives charitable performances.

We also note that Mr. Smith made an effort to rectify some of the consequences of Ms. Staley-Jackson's misappropriations and his own misconduct by trying to make the trust account whole out of his own pocket. This factor cuts both ways, however. Restitution of a loss caused by misconduct is what we would want of anyone in his place – and too few do.[15] But the manner in which Mr. Smith made this restitution violated Maryland Rule 16-607, delayed the notice of the shortfall to the Bar Counsel,[16] and had the effect of extending the fraud.

Mr. Smith's conduct evidences an inexcusable pattern of neglect with respect to the representation of several clients and the management of his trust account. It is this pattern of neglect towards the interests of his clients, the failure to conduct a reasonable investigation

---

[15] *See, e.g., Attorney Grievance Comm'n v. Bleecker*, 414 Md. 147, 178, 994 A.2d 928 (2010); *Attorney Grievance Comm'n v. Lewis*, 437 Md. 308, 85 A.3d 865 (2014). Indifference to making restitution is an aggravating factor under the ABA Standards. *See* Footnote 13 above.

[16] *See* Maryland Rules 16-605, 16-612, 16-722 (Bar Counsel to be notified of overdrafts in trust accounts and may audit account).

into his accounts and client files once he had notice of misconduct, and the significant harm to clients that warrants disbarment in this case. This Court has disbarred attorneys in prior cases involving a pattern of neglect of clients, even when there were no prior disciplinary actions against the attorney. *See, e.g., Attorney Grievance Comm'n v. Wallace,* 368 Md. 277, 293, 793 A.2d 535 (2002); *see also Attorney Grievance Comm'n v. Dominguez*, 427 Md. 308, 327, 47 A.3d 975 (2012); *Lara*, 418 Md. at 365; *Attorney Grievance Comm'n v. Faber*, 373 Md. 173, 183, 817 A.2d 205 (2003). Moreover, under MLRPC 5.3(c)(2), Mr. Smith is responsible for Ms. Staley-Jackson's misappropriation of client funds and her misrepresentations to conceal her fraud even though he did not himself intentionally misappropriate client funds or deceive clients. Given the volume and severity of Mr. Smith's misconduct, including the resulting misappropriation of client funds and concealment of information from clients, the factors found in mitigation do not warrant a lesser sanction than disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THE COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-761(B), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST EARL AMERICUS SMITH, III.**